# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DEBRA McGRATH,**

        **Plaintiff,**

    **v.**
                                    **Case No.: 2:16-cv-284**
                                           **JUDGE GEORGE C. SMITH**
                                         **Magistrate Judge Vascura**

**NATIONWIDE MUTUAL INSURANCE
COMPANY, *et al.*,**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court upon the Motion of Defendants Nationwide Mutual Insurance Company and Nationwide Insurance Company of America for Summary Judgment ("Nationwide's Motion for Summary Judgment") (Doc. 79). The motion is fully briefed and ripe for disposition. For the following reasons, Nationwide's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTUAL BACKGROUND

### A.    McGrath works for various Nationwide agents

In 2005, Plaintiff Debra McGrath was hired by Anthony Colosimo, a Nationwide agent, as an associate in his agency in Sewickley, Pennsylvania. (Doc. 83-1, McGrath Dep. at 14–15, 18). Shortly after McGrath began working for him, Colosimo was diagnosed with cancer. McGrath operated Colosimo's agency in his absence, and Colosimo passed away in February 2006. (*Id.* at 16–17). McGrath continued to operate the Colosimo agency and was also asked by Nationwide to service policies that had previously been serviced by another agency, until

Nationwide transitioned both books of policies to two other agents, Scott Diemert and Richard Marnic, in May 2006. (*Id.* at 19–20, 31–32). McGrath expressed interest in buying the servicing rights for one of the books, and Nationwide's Sales Manager for the Western Pennsylvania territory, Jim Montelone, told her that she would be offered the servicing rights to one of the two books if either Diemert or Marnic declined. (*Id.*). However, both accepted. (*Id.* at 33).

One of these agents, Marnic, hired McGrath as an associate at his agency in Beaver, Pennsylvania in June 2006. (*Id*. at 34, 36–37). About this time, McGrath alleges that Montelone promised her that she would receive the servicing rights to the next available book of policies. (*Id.* at 35). However, Montelone did not make any representations regarding the location of the book or how large it would be. (*Id.* at 36).

In February 2007, McGrath learned that the servicing rights to a book of policies that had been serviced by an agency in Chippewa, Pennsylvania had been sold to another agent. (*Id.* at 38–39). McGrath contacted Darryl Hohlbaugh, who had taken over as Sales Manager from Jim Montelone, to express her interest in obtaining the servicing rights for those policies. McGrath alleges that Hohlbaugh told her the servicing rights had already been sold, but that McGrath would receive the next available book of policies. (*Id.* at 39–40). In the meantime, McGrath continued to work for Marnic. (*Id.*).

In the spring of 2007, Emmett Santillo, another Sales Manager for Nationwide, approached McGrath to discuss her possible participation in Nationwide's Agency Capital Builder Program ("ACB Program"). (*Id.* at 43–44). Nationwide describes this program as "a 24-month agent training program that allowed individuals like McGrath a pathway toward potentially owning and operating a Nationwide agency." (Doc. 79, Mot. for Summ. J. at 6). Participants in the ACB Program "worked as a Nationwide employee in an existing Nationwide

agency, acquiring additional skills and training" needed for Nationwide's other agent programs. (*Id.*). "Once an agent met the requirements of the ACB Program, the agent could then become eligible to participate in one of Nationwide's Successor Programs. This is the next step for agents desiring to transition toward becoming a non-program 'career agent.'" (*Id.*)

McGrath says that during this meeting with Santillo, she noted Montelone's and Hohlbaugh's promises that she would receive the servicing rights to the next available book of policies. (*Id.*). Santillo allegedly told McGrath that she was not required to participate in the ACB Program before purchasing a book of servicing rights because she already had experience working with Nationwide. (*Id.* at 44).

In November 2007, McGrath learned that another book of policies had become available, and although she was in frequent contact with Hohlbaugh about her desire to purchase the servicing rights to this book, the rights were ultimately sold to another agent. (*Id.* at 44–45).

**B.    McGrath enters and successfully completes the ACB Program**

In late 2007 or early 2008, Santillo visited McGrath and told her that she would now be required to participate in the ACB program before she would be permitted to purchase the servicing rights to a book of policies. (*Id.* at 49–50). McGrath interviewed for the ACB Program with Santillo and Carol Miller, then a Nationwide Assistant Vice President of Sales in Pennsylvania. (*Id.* at 50). During this interview, McGrath alleges that Miller expressed "that she didn't think [McGrath] was a good candidate for the ACB Program because it was a very difficult and stringent program, and it took a lot—it was going to take a lot of energy and stamina was the word she used, and she was concerned because of [McGrath's] age." (*Id.* at 52). Nationwide denies these remarks were made.

McGrath was accepted into the ACB Program in July 2008. (*Id.* at 53, 64). On July 25, 2008, McGrath and Nationwide entered into an Agency Capital Builder Agreement ("ACB

Agreement") (Doc. 79-1 at PAGEID #1513–29). The ACB Agreement set forth various production goals that McGrath was required to achieve within the 24-month term of the Program. (*Id.* at Exhibit B). Three other provisions of the ACB agreement are pertinent here:

- Section 4, stating that "Except as provided in Section 16, [McGrath] agrees and understands that Nationwide has exclusive use and control of all expirations and therefore has the right and obligation to service Nationwide customers at any and all times, even to the exclusion of [McGrath]."

- Section 16, stating that "In the event [McGrath] satisfies [certain production goals], applies to participate in a Successor Program, and is approved by Nationwide, [McGrath] shall also, at Nationwide's discretion, earn the right to service either: (1) the book of business [McGrath] has developed while working as a Nationwide employee, or (2) a book of business with an equivalent value in a different location."

- Section 34, stating that "The terms and conditions contained in this Agreement supersede all prior oral or written understandings between [McGrath] and Nationwide and constitute the entire agreement between them concerning the subject matter of [the ACB Agreement]."

During the ACB Program, Santillo allegedly referred to McGrath as "Mother Hen," because she "had three years of Nationwide experience and nobody else did in the office, as far as the program and underwriting and all that kind of stuff, he would always tell them to go ask [McGrath]." (Doc. 83-1, McGrath Dep. at 103). Other agents also allegedly referred to her as "Yoda," whom they explained to her was "this little old guy, but he was really smart." (*Id.* at 104).

McGrath successfully completed the requirements of the ACB Program in 19 months, allowing her to complete the ACB Program early, and for which she received a $40,000 bonus. (*Id.* at 72). McGrath admits that no adverse employment actions were taken against her during the ACB Program. (*Id.* at 104).

## C.     McGrath enters Nationwide's Agency Executive (AE) Program

Following completion of the ACB Program, agents may become eligible to participate in one of Nationwide's Successor Programs.  Two such Successor Programs are the Agency Executive Program ("AE Program") and the Replacement Agency Executive Program ("RAE Program").  (Doc. 79, Mot. for Summ. J. at 8).  In the AE Program, agents open a scratch agency (that is, they "start from scratch" with no or few policies), while agents in the RAE Program purchase the servicing rights to a Nationwide-owned book of policies, which they begin servicing right away.  (*Id.*).

In June 2010, Nationwide invited McGrath to participate in the AE Program.  McGrath accepted, and on June 29, 2010, McGrath and Nationwide entered into an Agency Executive Program Performance Agreement (the "AE Agreement").  (Doc. 83-6).  McGrath's understanding was that, since there were no available books of policies at that time, her only option to "avoid ending her career as a Nationwide agent" was to enter into the AE Agreement.  (Doc. 83, Mem. in Opp. to Mot. for Summ. J. at 7; Doc. 83-1, McGrath Dep. at 115).

The AE Agreement provided that McGrath was an independent contractor, responsible for paying all business expenses and federal, state, and local income and self-employment taxes, and having "independent judgment as to time, place, and manner of soliciting insurance [and] servicing policyholders."  (Doc. 83-1, AE Agreement §§ 2–3).  The AE Agreement also reserves to Nationwide "exclusive use and control of all policies and policy expirations and [Nationwide] therefore has the right to service Nationwide customers at any time."  (*Id.* § 2).

McGrath was also subject to a Minimum Production Plan, performance under which was "calculated on a 12 month moving basis," and Nationwide "reserve[d] the right to change the Minimum Production Plan during the term of [the AE Agreement]."  (*Id.* §§ 7–8).  Finally, the AE Agreement also contained an integration clause, stating, "[t]he terms and conditions

contained in this Agreement supersede all prior oral or written understandings between [McGrath] and Nationwide and constitute the entire agreement between them concerning the subject matter of [the AE Agreement]." (*Id.* §38).

McGrath alleges that she was concerned "at the very beginning" with the production requirements for the second year of the AE program, as it entailed a substantial increase from the production requirements in the first year. (Doc. 83-1, McGrath Dep. at 140). However, Santillo allegedly told her she "didn't have to worry about that because by that time, [she] would be offered an agency to purchase." (*Id.*)

During her first year in the AE Program (July 2010 to July 2011), McGrath learned that at least four other agents had been given the opportunity to purchase the servicing rights to existing books of policies. (Doc. 83-1, McGrath Dep. at 172). McGrath contacted Hohlbaugh several times to express that she was "troubled that [she was] not getting the opportunity that [she saw] everybody else getting." (*Id.* at 173). McGrath viewed Nationwide's inability or refusal to sell her the servicing rights to an existing book of policies as "a breach of a promise." (*Id.* at 175).

## D.    McGrath and Nationwide enter into an Amendment to the AE Agreement

On February 24, 2012, Hohlbaugh emailed McGrath to say that he would be visiting her agency to have her sign "an addendum related to a possible tax liability[,] not a big deal" and that "all program agents have the same addendum change." (Doc. 83-10, Emails, at PAGEID #2322–23). On March 1, 2012, Hohlbaugh visited McGrath's agency, presented her with an Amendment to Agency Executive Program Performance Agreement ("AE Amendment," Doc. 83-10 at PAGEID #2324–26), and asked her to sign it. (Doc. 83-1, McGrath Dep. at 189). Hohlbaugh again stated that the amendment related to tax liability and wasn't a big deal. (*Id.*)

McGrath requested time to study the AE Amendment, but she alleges that Hohlbaugh refused, telling McGrath that he needed to leave her office with the signed amendment that day, and that if she did not sign it immediately, she would be terminated from the AE Program. (*Id.* at 189–91). McGrath then executed the AE Amendment without having read it. (*Id.*)

The AE Amendment includes provisions related to compliance with Section 409A of the Internal Revenue Code. One of these provisions altered the calculation for any early termination payment that might be due to McGrath in the event of cancellation of the AE Agreement before the end of its otherwise four-year term. (Doc. 83-10, AE Amendment § 4).

**E.      Nationwide cancels its AE Agreement with McGrath**

Nationwide amended McGrath's production goals at various points during the term of the AE Agreement. The amounts McGrath was required to meet fluctuated, but they never exceeded the production requirements in the original schedule. (Doc. 83-1, McGrath Dep. at 163–64; Doc. 79-1, AE Minimum Production Schedules, PAGEID #1567–75).

McGrath was able to meet her monthly production requirements during the first year of the AE Agreement term, in part because she was credited with the approximately $343,000 in premium she had achieved during the ACB Program. (Doc. 83-1, McGrath Dep. at 137–38; Doc. 79-1, PAGEID #1587–1613, Program Agent Performance Reports). But starting in July 2011, McGrath failed to meet her monthly production requirements and was never able to get back on track. (*Id.*). On September 1, 2011, McGrath signed a production shortfall program coaching plan stating that "failure to show progress above minimal requirements after one month on the coaching plan will result in your being moved to a formal Administrative (Performance) Action Plan." (Doc. 79-1, PAGEID #1576–78, Production Shortfall Program—Coaching Plan, at 2).

McGrath's inability to meet her production goals continued, and on October 27, 2011, she signed an Administrative Action Plan, which stated, "Please remember that failure to meet the minimum production requirements by the end of this Administrative (Performance) Action Plan period may result in cancellation of your Agent's Agreement with Nationwide." (Doc. 79-1, PAGEID #1579–80, Production Shortfall Program—Administrative Action Plan, at 2).

As a result of McGrath's further inability to meet her production requirements into 2012, Nationwide terminated McGrath's AE Agreement on July 23, 2012. (Doc. 79-1, PAGEID #1586, Letter from Darryl Hohlbaugh dated July 23, 2012). Nationwide then hired McGrath as an employee (paid at an hourly rate, rather than on commission) to continue servicing her agency's policies until the servicing rights to that book of policies was sold to another agent in December 2012. (Doc. 83-1, McGrath Dep. at 203–04).

## II.     PROCEDURAL HISTORY

McGrath filed a complaint with the Pennsylvania Human Relations Commission (PHRC) on February 7, 2013, alleging that Nationwide discriminated against her on the basis of her age and sex. (Doc. 1-1, PAGEID #90, PHRC Right to Sue Letter). The PHRC issued a right to sue letter to McGrath on April 9, 2013, finding that her allegations failed to state a cause of action under the Pennsylvania Human Relations Act (PHRA). (*Id.*).

On April 15, 2014, McGrath filed a praecipe for a Writ of Summons from the Court of Common Pleas of Allegheny County, Pennsylvania, and filed her Complaint in the same court on January 27, 2015. The Complaint contains nine counts: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) fraud in the inducement; (4) intentional misrepresentation/fraud; (5) unjust enrichment; (6) discrimination on the basis of age and sex under the PHRA; (7) wrongful discharge in violation of the PHRA and of public policy;

(8) negligent infliction of emotional distress; and (9) intentional infliction of emotional distress. (Doc. 1-1, Compl.).

Nationwide timely removed the action on the basis of diversity of citizenship to the U.S. District Court for the Western District of Pennsylvania on February 27, 2015. (Doc. 1, Notice of Removal). Subsequently, the Western District of Pennsylvania granted Nationwide's motion to transfer the action to the Southern District of Ohio pursuant to 28 U.S.C. § 1404(a) and a forum selection clause in the AE Agreement designating Franklin County, Ohio as the proper forum for "any action or proceeding arising from a dispute concerning the AE Program." (Doc. 59, Transfer Order; Doc. 83-6, AE Agreement § 40).

On May 30, 2017, Nationwide filed the present Motion for Summary Judgment, seeking judgment in its favor on all nine counts in Plaintiff's Complaint. (Doc. 79). On July 12, 2017, McGrath filed a brief in opposition (Doc. 83) in which she relied heavily on the Ohio appellate decision *Lucarell v. Nationwide Mut. Ins. Co.*, 2015-Ohio-5286, 44 N.E.3d 319 (7th Dist.) in arguing against summary judgment on her contract claims. Nationwide filed a reply brief on August 9, 2017 (Doc. 86). On January 9, 2018, Nationwide filed a notice of supplemental authority noting that the Seventh District Court of Appeals' decision in *Lucarell* had been overturned by the Ohio Supreme Court. (Doc. 89). The Court has considered all of these filings in reaching its decision on Nationwide's Motion for Summary Judgment.

### III.    SUMMARY JUDGMENT STANDARD

Nationwide moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine

9

the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (after burden shifts, nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). But self-serving affidavits alone are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## IV.    DISCUSSION

Nationwide has moved for summary judgment on all nine of McGrath's claims. The Court will discuss each claim in turn.

### A.    Breach of contract and breach of the implied duty of good faith and fair dealing (Counts I and II)

McGrath claims that Nationwide breached both the express terms of the ACB and AE Agreements and the duty of good faith and fair dealing that is implied in every contract. (Doc. 1-1, Compl. ¶¶ 57–61).  Nationwide argues that even accepting McGrath's version of the facts, there is no evidence that Nationwide breached any of its express or implied contractual obligations. (Doc. 79, Mot. for Summ. J. at 14–22).  The Court agrees.

#### 1.    Breach of the ACB Agreement

McGrath alleged in her Complaint that Nationwide breached the ACB agreement "by refusing to allow Ms. McGrath to either 1) acquire the book of business she built in the ACB Program, or 2) acquire a similar book of business in a different location pursuant to the ACB Agreement." (Doc. 1-1, Compl. ¶ 57).  Nationwide responds that the ACB agreement contains no promises to do either of these things, and even if it did, McGrath admitted at her deposition that she did, in fact, receive the servicing rights to the book of policies she built during the ACB Program when she entered the AE Program. (Doc. 79, Mot. for Summ. J. at 14–15; Doc. 79-1, ACB Agreement, PAGEID #1513–29; Doc. 83-1, McGrath Dep. at 81, 137–38).

McGrath does not address her claim for breach of the ACB agreement in her opposition brief and appears to have abandoned it.  Upon review of the ACB agreement and McGrath's testimony confirming Nationwide's factual assertions, Nationwide is entitled to summary judgment on the claim for breach of the ACB agreement.

### 2. Breach of the AE Agreement

McGrath alleges that Nationwide breached the AE Agreement in the following ways (Doc. 1-1, Compl. ¶¶ 58-60):

#### a. Failing to make correct payments for bonuses and commissions

McGrath alleges that Nationwide failed to make correct bonus and commission payments to her. But McGrath admitted at her deposition that she does not know whether or to what extent commissions were not paid, because she has not undertaken any calculations of what she claims was due her. (Doc. 83-1, McGrath Dep. at 155–56). Accordingly, Nationwide argues this claim should fail for lack of evidentiary support. (Doc. 79, Mot. for Summ. J. at 17).

#### b. Failing to adhere to the production plan and goals as set forth in the AE agreement

McGrath alleges that Nationwide unilaterally changed both the amounts of her production requirements during the AE Program and the way they were measured—i.e., from a cumulative to a rolling 12-month basis. However, as Nationwide points out, the AE Agreement expressly permitted Nationwide to make unilateral changes to McGrath's production requirements. (Doc. 83-6, AE Agreement, § 8). Further, when the production requirements were changed, they were lower than original production schedule, thus making it easier for McGrath to achieve the production goals. (Doc. 83-1, McGrath Dep. at 163–64; Doc. 79-1, AE Minimum Production Schedules, PAGEID #1567–75). Finally, the AE Agreement also expressly states that McGrath's production requirements would be "calculated on a 12 month moving basis." (Doc. 83-6, AE Agreement, § 7). McGrath confirmed she was aware her production would be measured on a rolling basis during the ACB Program before she signed the AE Agreement. (Doc. 83-1, McGrath Dep. at 94–101). Accordingly, Nationwide argues that these allegations of breach are not supported by the evidence.

### c.     Failing to credit or pay McGrath in full under the agreements for policies procured while enrolled in the ACB program

McGrath's Complaint alleges that Nationwide breached the AE Agreement by "not crediting nor paying McGrath in full under the agreements for policies procured while enrolled in the ACB Program." (Doc. 1-1, Compl. ¶ 60). Nationwide responds that nothing in the AE Agreement requires this, and that McGrath *did* receive credit for the amount of premium she generated during the ACB program. (McGrath Dep. at 125, 137–38).

In response to all of these arguments by Nationwide concerning lack of breach of the AE Agreement, McGrath does not identify any disputed facts. Instead, she relies solely on the Ohio appellate decision in *Lucarell v. Nationwide Mut. Ins. Co.*, 2015-Ohio-5286, 44 N.E.3d 319 (7th Dist.).[1]  In *Lucarell*, another agent who participated in Nationwide's AE Program sued Nationwide, alleging it had breached a similar AE Agreement "by (i) unilaterally imposing an unrealistic business plan on her, (ii) forcing her to sign an amendment to her AE Agreement which, among other things imposed a payment to Nationwide of $5,000, and (iii) misleading her through false promises and information to entice her into contributing to the AE Program." (Doc. 83, Mem. in Opp. to Mot. for Summ. J. at 14). The Seventh District upheld a jury verdict in favor of Lucarell on her breach of contract and breach of the duty of good faith and fair dealing claims. *Lucarell* at ¶ 82. McGrath argues that if facts similar to hers were sufficient to support a jury verdict in the agent's favor, then her facts must be sufficient to prevent summary judgment in Nationwide's favor. (Doc. 83, Mem. in Opp. to Mot. for Summ. J. at 15).

There are two problems with McGrath's approach to her breach of contract claim. First, she has the obligation to identify specific facts that are in dispute that would preclude summary

---

[1] Both parties' briefs cite only Ohio case law in relation to McGrath's contract claims, and the AE Agreement has a choice of law provision stating that "this Agreement shall be governed by the laws of the State of Ohio." (Doc. 83-6 at § 40). The Court will therefore apply Ohio law to McGrath's claims for breach of contract and breach of the duty of good faith and fair dealing.

judgment in *her* case. Fed. R. Civ. P. 56(e); *Cox*, 53 F.3d at 150. She cannot discharge this obligation simply by making a general analogy to another case with non-identical (albeit similar) facts.

Second, the appellate *Lucarell* decision has since been overturned by the Ohio Supreme Court. ___ Ohio St. 3d ___, Slip Opinion No. 2018-Ohio-15, ¶ 47. While the appellate court determined it could not review the jury's verdict in favor of the agent on the breach of contract claims due to Nationwide's failure to submit interrogatories to the jury regarding the basis for the verdicts, the Ohio Supreme Court found this was reversible error. The appellate court still had an obligation to determine whether sufficient evidence supported the jury's verdicts and its failure to do so required reversal. *Id.*

Overall, McGrath has failed to identify a genuine issue of material fact as to her breach of contract claims, and the single case she relies on has now been overturned by the Ohio Supreme Court. Because the uncontroverted facts demonstrate no breach of the AE Agreement, Nationwide is entitled to summary judgment on Count I.

### 3. Breach of the implied duty of good faith and fair dealing

Count II of McGrath's Complaint alleges that Nationwide breached the duty of good faith and fair dealing implied in both the ACB and AE Agreements. But as pointed out by Nationwide, Ohio does not recognize a standalone claim for breach of the implied duty of good faith and fair dealing. *E.g.*, *Frisch v. Nationwide Mut. Ins. Co.*, 553 F. App'x 477, 482 (6th Cir. 2014) (although Ohio law recognizes the existence of an implied duty of good faith and fair dealing in every contract, "the duty does not create an independent basis for a cause of action.") (quoting *Wendy's Int'l, Inc. v. Saverin,* 337 F. App'x 471, 476 (6th Cir. 2009)).

The implied duty may give rise to a *breach of contract* claim when the term allegedly breached is the implied duty of good faith and fair dealing. *Eggert Agency, Inc. v. NA Mgmt.*

*Corp.*, No. C2-07-1011, 2008 WL 3474148, at *4 (S.D. Ohio Aug. 12, 2008) (Sargus, J.). And McGrath did allege that "Nationwide breached its duties of good faith and fair dealing towards Ms. McGrath with respect to the [ACB and AE] agreements" in her breach of contract claim in Count I of her Complaint. (Doc. 1-1, ¶ 61).

However, "[t]here can be no implied covenants in a contract in relation to any matter specifically covered by the written terms of the contract itself." *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Co.*, 86 Ohio St. 3d 270, 274 (1999) (citing *Kachelmacher v. Laird*, 92 Ohio St. 324 (1915), paragraph one of the syllabus). This is especially true in the presence of an integration clause, such as those in both the ACB and AE Agreements. *Interstate Gas Supply, Inc. v. Calex Corp.*, 10th Dist. No. 04AP-908, 2006-Ohio-638, ¶¶ 99–101; *Gilchrist v. Saxon Mtge. Servs.*, 10th Dist. No. 12AP-556, 2013-Ohio-949, ¶ 24. Here, McGrath claims Nationwide lured her into participating in its agent programs through false promises regarding her ability to purchase the servicing rights to an existing book of policies. But her written agreements with Nationwide specifically spoke to her obligations to earn commissions through her generation of new policies, not through servicing existing policies. Therefore, there could be no implied covenants on this point for Nationwide to breach.

Finally, "a party to a contract does not breach the implied duty of good faith and fair dealing by seeking to enforce the agreement as written or by acting in accordance with its express terms, nor can there be a breach of the implied duty unless a specific obligation imposed by the contract is not met." *Lucarell*, ___ Ohio St. 3d ___, 2018-Ohio-15, ¶ 5. "Thus, there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Id.*, ¶ 43. Because McGrath has not identified

any specific contract term, express or implied, that Nationwide breached, her claim for breach of the implied duty of good faith and fair dealing must also fail.

**B. Fraud and fraudulent inducement (Counts III and IV)**

McGrath bases her fraud claim on the alleged multiple misrepresentations by Nationwide that she would be permitted to purchase the servicing rights to an existing book of policies. (Doc. 1-1, Compl. ¶¶ 93–94). She also alleges that she was fraudulently induced to enter into the ACB Agreement and AE Agreement (based on the same promises that she would receive servicing rights to an existing book) as well as the AE Amendment (based on Hohlbaugh's statements that it related to "tax liability," was "not a big deal," had to be executed immediately, and that failure to execute it immediately would result in Nationwide's cancellation of the AE Agreement). (*Id.* ¶¶ 72–87).

**1. Choice of law regarding statute of limitations**

Nationwide argues that McGrath's fraud and fraudulent inducement claims (excepting McGrath's claims regarding the AE Amendment) are barred by Pennsylvania's two-year statute of limitations for fraud claims. 42 Pa. Cons. Stat. § 5524(7). McGrath does not dispute that her fraud claims are governed by Pennsylvania's two-year limitation period (rather than Ohio's four-year limitation period under O.R.C. 2305.09(C)). Indeed, the result is the same no matter which state's statute of limitations is applied, due to Ohio's "borrowing statute." O.R.C. 2305.03(B).

The borrowing statute provides that "[n]o civil action that is based upon a cause of action that accrued in any other state . . . may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state . . . has expired." *Id.* The Sixth Circuit has outlined the factors used to evaluate where a fraud claim accrues for purposes of Ohio's borrowing statute, namely, "(1) the place where plaintiff acted in reliance on defendant's representations, (2) the place where plaintiff received the representation, (3) the

place where defendant made the representation, and (4) the place of business of the parties." *Frisch v. Nationwide Mut. Ins. Co.*, 553 F. App'x 477, 484 (6th Cir. 2014) (citing *Carder Buick–Olds Co. v. Reynolds & Reynolds, Inc.,* 148 Ohio App.3d 635, 775 N.E.2d 531, 544 (2002) § 148(2) of the Restatement (Second) of Conflict of Laws).

Thus, even if Ohio law applied to the limitation period for McGrath's fraud claims, those fraud claims accrued in Pennsylvania—all alleged misrepresentations were made there; McGrath, her agency, and the Nationwide representatives she dealt with were located there; and McGrath executed agreements in alleged reliance on Nationwide's misrepresentations there. Ohio law would therefore "borrow" Pennsylvania's two-year limitation period. *Frisch*, 553 F. App'x at 484.

### 2. Application of Pennsylvania's two-year statute of limitations

Nationwide argues McGrath's fraud claims are largely time-barred because any alleged misrepresentations (other than those in connection with McGrath's execution of the AE Amendment in 2012) were made and discovered to be false more than two years before McGrath commenced this action. McGrath alleges that:

- She was told by Montelone in June 2006 that she would offered the next available book of policies, but Michelle Whitman received the rights to policies in Chippewa, Pennsylvania in February 2007 (Doc. 83-1, McGrath Dep. at 35–40);

- She was told by Hohlbaugh in February 2007 that she would offered the next available book of policies, but another available book was sold to a different agent in November 2007 (*id.* at 39–45);

- She was told by Santillo in the spring of 2007 that she would be able to purchase the rights to a book of policies without completing the ACB Program, but was

later told she would need to first complete the ACB Program in late 2007 or early 2008 (*id.* at 43–50);

- She was told by Santillo in mid-2010 that she needn't worry about her production goals for the second year of her AE Program, because she would be offered the servicing rights to an existing book of policies before those goals took effect; however she was not offered a book of policies after her first year which ended mid-2011 (*id.* at 140).

As McGrath knew or should have known these representations were false no later than July 2011, and McGrath did not commence this action until April 14, 2014 when she filed a praecipe for a writ of summons,[2] Nationwide argues that any claims based on these misrepresentations are time-barred.

In response, McGrath asserts for the first time in her opposition brief that in "May 2012, Mr. Hohlbaugh, acting as Nationwide's sales manager, continued to assure Ms. McGrath that she would be offered the opportunity to purchase the servicing rights to a Nationwide book of business as soon as one became available." (Doc. 83, Mem. in Opp. to Mot. for Summ. J. at 11). McGrath supports this assertion with an affidavit executed by her. (Doc. 83-7, McGrath Aff. ¶ 4). An alleged misrepresentation made in May 2012 would fall within the two-year limitation period preceding the commencement of McGrath's action on April 14, 2014.

Nationwide argues this new allegation is merely a "self-serving, eleventh hour affidavit" that "contradicts McGrath's own prior allegations, sworn discovery responses, and sworn testimony that these supposed representations occurred in and before 2011." (Doc. 86, Reply in Supp. of Mot. for Summ. J. at 6). The Court disagrees with this characterization.

---

[2] In Pennsylvania, a plaintiff may commence an action by filing either a praecipe for writ of summons or a complaint. Pa.R.C.P. No. 1007.

While it is true that "[a] party cannot avoid summary judgment through the introduction of self-serving affidavits that contradict prior sworn testimony," the Court finds no material contradiction here. *U.S. ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 303 (6th Cir. 1998). Nationwide argues the contradiction arises out of McGrath's sworn response to one of Nationwide's interrogatories, in which she identified only James Montelone, Kevin Keto, and Emmett Santillo as having made promises to her regarding the opportunity for her to purchase the servicing rights to an existing book of policies. (Doc. 86-2, McGrath's Interrog. Resps. at 6). While it is certainly curious that McGrath failed to list Hohlbaugh in this response, she identified Hohlbaugh multiple times as having made such a promise in her Complaint and sworn deposition testimony. (Doc. 1-1, Compl. ¶ 47; Doc. 83-1, McGrath Dep. at 35–40). Indeed, Nationwide included Hohlbaugh's alleged promises in 2007 in its statement of facts in support of the present Motion. (Doc. 79 at 4). McGrath also never asserted in her Complaint, interrogatory responses, or deposition testimony that Hohlbaugh never repeated those promises after 2011. Thus, her affidavit is not inconsistent with her prior submissions.

Nationwide also contends that even if the Court may consider the affidavit, it does not help McGrath because she cannot demonstrate any detrimental reliance on Hohlbaugh's alleged May 2012 promise. (Doc. 86, Reply in Supp. of Mot. for Summ. J. at 8). Here, Nationwide is correct.

Both fraud and fraud in the inducement require a plaintiff to have justifiably relied upon a misrepresentation in order to succeed. *Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St. 3d 494, 2010-Ohio-2057, 929 N.E.2d 434, ¶ 27 (fraud); *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 478 (6th Cir. 2014) (fraudulent inducement).[3] McGrath states that Nationwide's "false

---

[3] In contrast to the statute of limitations, neither party makes a definitive argument that the *substantive* law of either Ohio or Pennsylvania should apply to McGrath's tort claims. Sitting in diversity, this Court must apply the choice

promises convinced Ms. McGrath to continue to run the Colosimo and Helkowski agencies, enter and complete Nationwide's ACB Program, and enter Nationwide's AE Program." (Doc. 83, Mem. in Opp. to Mot. for Summ. J. at 17). However, McGrath took all of those actions no later than June 2010; therefore, she could not have relied on Hohlbaugh's May 2012 promise in taking those actions.

Accordingly, Nationwide is correct that McGrath's fraud and fraudulent inducement claims (excepting those related to McGrath's entering into the AE Amendment in March 2012) have "either a fatal statute of limitations problem or a fatal reliance problem." (Doc. 86, Reply in Supp. of Mot. for Summ. J. at 9). All alleged misrepresentations were either proven false outside the limitations period, or made after the actions that McGrath allegedly took in reliance on those representations. Therefore, Nationwide is entitled to summary judgment on McGrath's fraud and fraudulent inducement claims, with the exception of the fraudulent inducement claim related to the execution of the AE Amendment in March 2012. The Court considers this claim next.

### 3. Fraudulent inducement to enter into the AE Amendment

McGrath alleges that Hohlbaugh made several misrepresentations that fraudulently induced her to enter into the AE Amendment on March 1, 2012. Namely, McGrath alleges that Hohlbaugh falsely stated:

---

of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). And even though this case was originally in federal court in Pennsylvania, and the transferor state's choice of law rules typically follow a case transferred under 28 U.S.C. § 1404(a), this case falls under the exception for transfers pursuant to a contractual forum selection clause. *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 582 (2013). Thus, applying Ohio's conflicts of law rules, "if two jurisdictions apply the same law, or would reach the same result applying their respective laws, a choice of law determination is unnecessary because there is no conflict, and the laws of the forum state apply." *DRFP, LLC v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890, 908–09 (S.D. Ohio 2013) (Sargus, J.).

Neither the parties nor the Court have identified any relevant ways in which Ohio and Pennsylvania law differ on McGrath's tort claims. It is therefore unnecessary to undertake a choice of law analysis, and the Court will apply Ohio law to McGrath's tort claims.

- The AE Amendment related to a possible tax liability;

- The AE Amendment was "not a big deal";

- The AE Amendment needed to be executed by the time Hohlbaugh left McGrath's office that day; and

- If McGrath did not execute the AE Amendment that day, Nationwide would cancel its AE Agreement with McGrath.

(Doc. 83-1, McGrath Dep. at 189–90).

Nationwide argues that McGrath cannot maintain a claim for fraudulent inducement because she admits she did not read the AE Amendment before she signed it. McGrath testified at her deposition that she did not read the AE Amendment because she was running late for an important business meeting and Hohlbaugh would not allow her read the Amendment and fax an executed copy to him later that evening. (*Id.*)

Ohio law does limit the ability to recover for fraudulent inducement in cases of failure to read. *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 501, 503, 692 N.E.2d 574 (1998) ("A person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different from what he intended, when he could have known the truth by merely looking when he signed."). Be that as it may, failure to read would bar only those claims based on misrepresentations as to the *contents* of the agreement. Even if McGrath had read the AE Amendment before signing, it would not have revealed the truth or falsity of Hohlbaugh's statements that the Amendment needed to be signed immediately upon pain of cancellation of the AE Agreement.

Nationwide contends, however, that "any supposed threat of cancelation does not constitute fraudulent inducement." (Doc. 79, Mot. for Summ. J. at 29) (citing *Frisch v.*

*Nationwide*, 553 F. App'x at 482). In *Frisch*, another Nationwide agent challenged the same AE Amendment that McGrath asserts she was fraudulently induced to sign. In that case, the Sixth Circuit stated that "[i]f Plaintiff did not like the terms of the [AE Amendment], he should have declined to execute it, and if Defendant refused to continue performing under the AE, sued for breach of contract at that time." 553 F. App'x at 482. However, this statement was not made in the context of a fraudulent inducement claim—rather, Frisch was attempting to maintain a claim for breach of the unmodified AE Agreement and had not alleged fraudulent inducement with regard to the AE Amendment. *Id.* The *Frisch* court made the statement quoted by Nationwide as part of its conclusion that Frisch could not recover for breach of a contract no longer in effect. The *Frisch* decision therefore does not speak to whether threat of cancelation can constitute fraudulent inducement.

All McGrath must establish in order to succeed on her fraudulent inducement claim is: "(1) a false representation concerning a fact . . . material to the transaction; (2) knowledge of the falsity of the representation or utter disregard for its truthfulness; (3) an intent to induce reliance on the representation; (4) justifiable reliance upon the representation under circumstances manifesting a right to rely; and (5) injury proximately caused by the reliance." *McCarthy*, 763 F.3d at 478 (quoting *Metro. Life Ins. Co. v. Triskett Ill., Inc.*, 97 Ohio App.3d 228, 646 N.E.2d 528, 532 (1st Dist. 1994)). McGrath has alleged in her Complaint and testified at her deposition that Hohlbaugh falsely stated that the AE Amendment needed to be signed immediately, or else Nationwide would cancel the AE Agreement; that Hohlbaugh intended her to rely on this statement; that she in fact relied on that statement in executing the AE Amendment; and that she was injured as a result of the AE Amendment's changes to the calculation of her early cancelation payments.

Nothing in Nationwide's Motion either forecloses McGrath's ability to prove these allegations at trial or establishes that these allegations cannot constitute fraudulent inducement as a matter of law. Accordingly, Nationwide is not entitled to summary judgment on McGrath's claims of fraudulent inducement regarding the AE Amendment.

## C.     Unjust enrichment (Count V)

McGrath alleges in her Complaint that Nationwide "assumed control over the business that Ms. McGrath had built" and that "[a]s a result of its conduct toward Ms. McGrath, Nationwide unjustly kept the benefits of Ms. McGrath's work and profited off of the sale of the business which Ms. McGrath had built, with no compensation to Ms. McGrath." (Doc. 1-1, Compl. ¶¶ 101–02).

Nationwide argues that McGrath cannot maintain an unjust enrichment claim where the relationship between the parties was governed by an express contract whose terms cover the subject matter of the unjust enrichment claim. (Doc. 79, Mot. for Summ. J. at 30–31). The Court agrees.

Although a plaintiff may *plead* claims for breach of contract and unjust enrichment in the alternative, a plaintiff may not recover on both claims. *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 46 Ohio St. 3d 51, 55, 544 N.E.2d 920, 924 (1989) (in the absence of fraud, illegality, or bad faith, plaintiffs may not recover in unjust enrichment and their only recourse is compensation in accordance with the terms of the written agreement).

Here, the ownership of the servicing rights to the book of policies built by McGrath always remained with Nationwide per the ACB and AE Agreements. (Doc. 79-1 at PAGEID #1513–29, ACB Agreement § 4; Doc. 83-6, AE Agreement § 2). The AE Amendment, which may or may not be invalid due to fraudulent inducement, did not alter these terms. Accordingly, since Nationwide's ownership of the policy servicing rights was governed by valid express

contracts, McGrath cannot, as a matter of law, maintain an unjust enrichment claim for Nationwide's retention of those ownership rights. Nationwide is therefore entitled to summary judgment on Count V of McGrath's Complaint.

**D.    Age and sex discrimination under the PHRA (Count VI)**

McGrath alleges that she was passed over for the opportunity to purchase the servicing rights to an existing book of policies on the basis of her age and sex in violation of Pennsylvania's Human Relations Act (PHRA), 43 P.S. § 955(a). (Doc. 1-1, Compl. ¶ 116). To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the Pennsylvania Human Relations Commission (PHRC) within 180 days of the alleged act of discrimination. 43 P.S. §§ 959(h), 962; *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997). Nationwide argues that because the last alleged "act of discrimination" occurred when Nationwide terminated McGrath's AE Agreement on July 23, 2012, and McGrath's complaint with the PHRC was not filed until 199 days later on February 7, 2013, McGrath's PHRA claims are time-barred. (Doc. 79, Mot. for Summ. J. at 33–35).

"Pennsylvania courts have strictly interpreted [the 180-day] time requirement, and have repeatedly held that 'persons with claims that are cognizable under the Human Relations Act must avail themselves of the administrative process of the Commission or be barred from the judicial remedies authorized in Section 12(c) of the Act.'" *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 535 (W.D. Pa. 2010) (quoting *Woodson*, 109 F.3d at 925 and *Vincent v. Fuller Co.*, 532 Pa. 547, 616 A.2d 969, 974 (Pa. 1992)). "By necessary implication, 'one who files a complaint with the Commission that is later found to be untimely cannot be considered to have used the administrative procedures provided in the Act.'" *Garner v. SEPTA*, 116 A.3d 1190 (Pa. Commw. Ct. 2015). *Accord Zysk v. FFE Minerals USA Inc.*, 225 F. Supp. 2d 482, 493 (E.D. Pa. 2001); *Vandergrift v. Atl. Envelope Co.*, No. CIV.A. 02-9215, 2004 WL 792384, at *3 (E.D. Pa.

Apr. 6, 2004); *Allen v. Best Foods Baking Co.*, No. CIV.A. 02-CV-3663, 2003 WL 22858351, at *3 (E.D. Pa. Oct. 22, 2003).

McGrath concedes that she filed her complaint with the PHRC more than 180 days after the termination of her AE Agreement. However, McGrath argues that her PHRC complaint was nevertheless timely because "Nationwide finally terminated their relationship with Ms. McGrath on December 31, 2012." (Doc. 83, Mem. in Opp. to Mot. for Summ. J. at 19). But although Nationwide terminated McGrath's employment as an hourly employee on December 31, 2012, when it sold the servicing rights to the policies associated with McGrath's scratch agency to another agent, McGrath has not alleged any discrimination in connection with that action. McGrath alleges discrimination based only on "Nationwide's refusal to offer Ms. McGrath the opportunity to purchase an existing agency" and "Nationwide's termination of Ms. McGrath as an insurance agent." (Doc. 1-1, Compl. ¶¶ 116–17). Both of those actions were taken no later than July 23, 2012, when Nationwide terminated McGrath's AE Agreement.

As a result, McGrath has failed to properly invoke the PHRA's administrative procedures that are prerequisite to maintaining a PHRA claim in this Court. Nationwide is therefore entitled to summary judgment on Count VI of McGrath's Complaint.

**E.      Wrongful discharge in violation of the PHRA and public policy (Count VII)**

McGrath further challenges her termination as a Nationwide insurance agent as violating the PHRA and Pennsylvania's public policy against age and sex discrimination. To the extent Count VII of the Complaint relies on the PHRA, the Court has already determined that those claims are time barred. And as Nationwide correctly points out, Pennsylvania's tort of wrongful discharge in violation of public policy is precluded when a statutory remedy exists for the wrongful discharge. *Clay v. Advanced Computer Applications, Inc.*, 522 Pa. 86, 89, 559 A.2d 917, 918 (1989) ("[T]he PHRA provides a statutory remedy that precludes assertion of a

common law tort action for wrongful discharge based upon discrimination."); *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 941 (3d Cir. 2003) ("Pennsylvania law does not recognize a common law cause of action for violating public policy when there is a statutory remedy.").

"Furthermore, it is the *existence* of a statutory claim, and not the *success* of one that determines preemption." *Palazzolo v. Damsker*, No. 10-CV-7430, 2011 WL 2601536, at *7 (E.D. Pa. June 30, 2011). Thus, it makes no difference that McGrath's claims under the PHRA happen to be time-barred. The Pennsylvania legislature has set forth a clear procedure for victims of alleged discrimination to follow, and that procedure requires invoking the PHRA's administrative and judicial remedies. Because the allegations underlying McGrath's claim for wrongful discharge are the province of the PHRA, she may not assert a common law claim for wrongful discharge based on those same allegations. Nationwide is therefore entitled to summary judgment on Count VII of McGrath's Complaint.

## F.    Negligent infliction of emotional distress (Count VIII)

Nationwide contends that McGrath's negligent infliction of emotional distress claim must fail because she has not alleged the basic elements of the claim. "Ohio courts have limited recovery for negligent infliction of emotional distress to such instances as where one was a bystander to an accident or was in fear of physical consequences to his own person." *Heiner v. Moretuzzo*, 73 Ohio St. 3d 80, 85, 1995-Ohio-65, 652 N.E.2d 664, 669. That is, some element of physical danger must underlie a claim for negligent infliction of emotional distress. While McGrath's Complaint alleges that she suffered emotional distress as a result of Nationwide's actions, she nowhere suggests any element of physical peril as required to succeed on this claim.

McGrath does not contest that her allegations are inadequate and, in fact, does not address her claim for negligent infliction of emotional distress at all in her opposition brief.

Because McGrath's allegations do not satisfy the elements of this claim, Nationwide is entitled to summary judgment on Count VIII of McGrath's Complaint.

## G.     Intentional infliction of emotional distress (Count IX)

In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff must establish, *inter alia*, that the defendant's conduct "was so extreme and outrageous as to go 'beyond all possible bounds of decency' and was such that it can be considered as 'utterly intolerable in a civilized community.'" *Williams v. York Int'l Corp.*, 63 F. App'x 808, 813 (6th Cir. 2003) (quoting *Pyle v. Pyle*, 11 Ohio App.3d 31, 463 N.E.2d 98, 103 (8th Dist. 1983) and Restatement (Second) of Torts § 46 cmt. d (1965)).  It is for the Court in the first instance to determine whether Nationwide's conduct may be regarded as so extreme and outrageous as to permit recovery. *White v. Honda of Am. Mfg., Inc.*, 191 F. Supp. 2d 933, 954–55 (S.D. Ohio 2002) (Sargus, J.) (citing *Crawford v. ITT Consumer Financial Corp.,* 653 F. Supp. 1184, 1192 (S.D. Ohio 1986) (Spiegel, J.) and Restatement (Second) of Torts § 46 cmt. h (1965)).

Both the Ohio Supreme Court and the Sixth Circuit have adopted Section 46 of the Second Restatement of Torts for determining whether the "extreme and outrageous" requirement has been met. *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983); *Polk v. Yellow Freight System,* 801 F.2d 190 (6th Cir. 1986).  That section notes that a defendant "is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."  Restatement (Second) of Torts § 46 cmt. g (1965).  Although such conduct may be "heartless," the defendant "has done no more than the law permits him to do, and he is not liable to [the plaintiff] for her emotional distress." *Id.*

Viewing the facts in the light most favorable to McGrath, the Court does not find Nationwide's conduct to be so outrageous as to support a claim for intentional infliction of

emotional distress. McGrath has described at most a standard business relationship that went sour, not a course of conduct stretching "beyond all possible bounds of decency" or "utterly intolerable in a civilized community." *See Klusty v. Taco Bell Corp.*, 909 F. Supp. 516, 523 (S.D. Ohio 1995) (Merz, M.J.) (no viable claim for intentional infliction of emotional distress where the plaintiff alleged only a "breach of contract and then [tried] to make that into an intentional infliction case merely by adding that Taco Bell did it to cause emotional distress and that Taco Bell was successful."). Accordingly, Nationwide is entitled to summary judgment on Count IX of McGrath's Complaint.

## V. CONCLUSION

For the foregoing reasons, Nationwide's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The Motion is denied as to McGrath's claim for fraudulent inducement regarding her execution of the AE Amendment on March 1, 2012. All other claims are **DISMISSED**.

The Court further recommends that the parties engage in mediation to resolve McGrath's remaining claim. If the parties wish to participate in mediation, they may contact Judge Vascura's chambers to schedule a mediation through the Court.

The Clerk shall remove Document 79 from the Court's pending motions list.

**IT IS SO ORDERED.**

_/s/ George C. Smith_____
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**